UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

HOLLY ANN MCDANIEL BUTE,

             Plaintiff,                           Case No. 1:16-cv-02199-YY

        v.                                     OPINION AND ORDER

COMMISSIONER OF SOCIAL
SECURITY,[1]

             Defendant.

YOU, Magistrate Judge:

## INTRODUCTION

Plaintiff, Holly A. McDaniel Bute ("Bute"), seeks judicial review of the final

decision by the Social Security Commissioner ("Commissioner") denying her application

for Disability Insurance Benefits ("DIB") and Supplementary Security Income ("SSI")

under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-433. This

---

[1] The official title of the head of the Social Security Administration ("SSA") is the "Commissioner of Social Security." 42 U.S.C. § 902(a)(1). Nancy A. Berryhill is currently the Acting Commissioner of Social Security. However, a "public officer who sues or is sued in an official capacity may be designated by official title rather than by name." FRCP 17(d).

court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). For the reasons set forth below, that decision is AFFIRMED.

## PROCEDURAL HISTORY

Bute protectively filed for DIB and SSI on March 5, 2013, alleging a disability onset date of August 1, 2012. Tr. 198, 205.[2] Her applications were denied initially and on reconsideration. Tr. 74-81, 106-16. On February 17, 2015, a hearing was held before Administrative Law Judge ("ALJ") Robert F. Spaulding. Tr. 42-73. The ALJ issued a decision on May 11, 2015, finding Bute not disabled. Tr. 21-33. After the Appeals Council denied Bute's request for review on October 26, 2016, the ALJ's decision became the Commissioner's final decision subject to review by this court. Tr. 1-4; 20 C.F.R. §§ 404.1581, 416.981.

## BACKGROUND

Born in September 1957, Bute was 58-years-old at the time of the ALJ hearing. Tr. 74. Bute is a high-school graduate and attended college for one year. Tr. 227. She worked as a mortgage banker from 1997 until August 1, 2012. Tr. 52, 103. Bute alleges she is unable to work due to a combination of: degenerative joint disease of the left hip; degenerative joint disease of the left shoulder; plantar fasciitis; sinus tarsi syndrome; obesity; anxiety; chronic fatigue, high blood pressure; edema; and hidradenitis suppurativa ("HS").[3] Tr. 73, 83; Pl.'s Br. at 2.

---

[2] Citations are to the page(s) indicated in the official transcript of the record filed on April 4, 2017 (ECF #11).

[3] Hidradenitis suppurativa is defined as "a chronic suppurative inflammatory disease of the apocrine sweat glands." *Merriam-Webster Medical Dictionary*, *available at* https://www.merriam-webster.com/medical/hidradenitis%20suppurativa (last visited Jan.

## RELEVANT MEDICAL BACKGROUND

On November 7, 2011, Bute was treated for an infected "bump" on her inner groin area[4] Tr. 357. She was diagnosed with HS and prescribed medication. *Id.* Bute did not have any skin lesions at treatment visits in December 2011. Tr. 373, 379. At that time, she also denied depression and anxiety, as well as muscle aches and joint pain. *Id.*

On April 18, 2012, treatment records show her HS was "improved." Tr. 359. Bute displayed no skin rashes at a medical visit on April 23, 2012. Tr. 355. In July 2012, records show that she had no skin lesions, no musculoskeletal pain, and no depression or anxiety. Tr. 362-64. She reported that she was moving to Oregon. Tr. 706.

In May 2013, Bute was treated by Cheri M. Monteith, a nurse practitioner ("NP") in Bly, Oregon. Tr. 393. Bute reported that she had recently moved to Oregon with her then fiancé (now husband) "for retirement."[5] *Id.* Bute stated that she had a history of HS with "approximately 5-6 flare ups per month," and that she was using Ampicillin every six hours for flare-ups. *Id.* On examination, Bute's skin was negative for lesions. Tr. 393-94.

On May 23, 2013, Mike Henderson, D.O., performed a consultative examination of Bute. Dr. Henderson diagnosed her primary impairment as "chronic fatigue," "due to severe

---

25, 2018). It is a "rare, long-term skin condition that features small, painful lumps under the skin. They typically develop where the skin rubs together, such as the armpits, the groin, between the buttocks and under the breasts." MAYO CLINIC, *available at* https://www.mayoclinic.org/diseases-conditions/hidradenitis-suppurativa/symptoms-causes/syc-20352306 (last visited March 22, 2018). Symptoms include "small, painful lumps under the skin . . . [which] may break open and smell or cause tunnels under the skin . . . . Early diagnosis and treatment can help manage symptoms, keep new lumps from forming and prevent complications, such as scarring or depression." *Id.*

[4] Bute's breakouts occur in her groin area but also sometimes occur in her armpits or other areas where her clothing touches her skin. Tr. 56, 942.

[5] Bute's husband is older than she is and was retired. Tr. 54.

depression associated with job loss, bankruptcy, home foreclosure, and divorce." Tr. 401. Bute told Dr. Henderson that she "quit her job to move to Oregon and reduce stress." Tr. 399. Dr. Henderson assessed left hip pain that "may be trochanteric bursitis versus mild posture arthritis." *Id.* He also assessed left shoulder impingement caused by a bone protrusion of the acromion, which restricted her overhead reaching above shoulder height. Tr. 400-01. Dr. Henderson opined that Bute's HS was "intermittent and treatable," but "[i]f she does have a flare, [she] would have to avoid prolonged sitting for more than an hour at a time." Tr. 401. Dr. Henderson concluded that there was no objective evidence to support a limitation in sitting, walking, or standing, and that Bute's "main limitations are secondary to obesity, deconditioning, [and] severe depression." *Id.*

In June 2013, Bute saw Dr. Edward Trobaugh. Her primary diagnosis was malaise and fatigue, likely caused by chronic fatigue syndrome "but may be OSA, depression, hypothyroidism." Tr. 440. Dr. Trobaugh also noted foot pain consistent with plantar fasciitis, citing weight as a factor. *Id.* Bute had gained 50 pounds over the previous five to six years, and her body mass index was 47. Tr. 439-40.

Bute began treatment with her primary care provider, Debra Hartley, M.D., in August 2013. Tr. 953. Bute expressed concern about her weight, fatigue, and general body pain, including leg pain when she walked. *Id.* She was 5'4" tall, weighed 278 pounds, and had a BMI of 47.72. Tr. 956.

In September 2013, Bute complained of left shoulder pain. Tr. 948. In 2007, she had an injury, which resulted in an MRI and diagnosis of "supraspinatus tear vs tendinopathy." She did pursue surgery, but had an injection in 2008, but still found the area was painful. *Id.* She received a steroid injection in her left shoulder. Tr. 949.

In October 2013, Bute reported that her shoulder pain improved following a steroid injection but she was still able to raise her elbow over her head. Tr. 423. Her range of motion was within normal limits. *Id.* Dr. Hartley also noted that Bute had a history of HS: "[s]he has a lesion on her inner groin area that will get big and will break open and a [sic] decrease in the pressure. She will then have pus and blood that seeps for a couple of days but does not heal. Right now it is not inflamed . . . outbreaks tend to be worse in the summer. She rarely has outbreaks in her axilla [armpits]." *Id.* The doctor indicated that Bute "will call when she has a flare up." Tr. 424.

Bute saw Dr. Laneah Snyder on February 12, 2014, to follow up on an emergency room visit for chest pain. Tr. 747. She displayed no skin rash at that time. *Id.*

On February 20, 2014, Bute was observed to have a skin rash on her face, neck, and upper chest, which was thought to be a "stress reaction." Tr. 1008-09.

On March 5, 2014, Bute's primary complaint was fatigue. Tr. 924. She was given a referral to a sleep medicine clinic. *Id.* Bute endorsed exercise-induced foot pain. *Id.* She was positive for skin rash, which was associated with anxiety. Tr. 922.

On May 1, 2014, Bute was again negative for skin rash. Tr. 915.

Bute was treated by NP Monteith again on May 12, 2014. Bute was advised to continue daily Hibiclens use and Ampicillin for HS outbreaks, but it was also noted that Bute's skin was negative for "concerning lesions." Tr. 788. Bute was referred to dermatology for continuing management of HS, and because Bute's sister had melanoma. Tr. 789.

On May 27, 2014, Bute received an injection in her left foot (specifically, the sinus tarsi). Tr. 774. Her doctor recommended she participate in walking exercises, but that she should avoid uneven surfaces. *Id.*

At a visit in June 2014, Bute was negative for skin rash. Tr. 909.

In July 2014, Bute asked for a referral to physical therapy for foot and hip pain. Tr. 994. It was noted Bute had never had an MRI of her back. *Id.* She was negative for skin rash. Tr. 995.

A "medical source statement" form was completed by physical therapist G. Eric Mills ("Mills") on July 23, 2014. Mills diagnosed left lower back pain with radiculopathy and left shoulder impingement syndrome, and indicated that the symptoms would "seldom" be severe enough to affect Bute's attention and concentration to work tasks. Tr. 834. He also indicated Bute could sit for four hours, stand for two hours, and walk for two hours of an eight-hour day. *Id.* He further noted that Bute would need to take short unscheduled breaks for positional changes four times per day. Tr. 836. Mills concluded Bute "would have a difficult time in most occupations due to her multiple medical conditions." Tr. 837.

Bute was negative for skin rash in July 2014. Tr. 991.

Bute was negative for skin rash in August 2014. Tr. 988.

Bute was negative for skin rash in December 2014 but requested an injection to address left shoulder pain. Tr. 984.

Bute was negative for skin rash in January 2015. Tr. 981.

In February 2015, Bute was positive for HS-related skin rash on examination. Tr. 977. Dr. Hartley indicated that Bute's prescription of spironolactone had been increased by the dermatologist, which "may have helped" the HS. *Id.*

In a therapy chart note dated January 9, 2015, Bute reported that her doctor did not want her to exercise and that she wanted to obtain disability to pay her bills. Tr. 860. In a follow-up appointment on January 30, 2015, Bute "still [had the] same issue/story [as] last time" and "ha[d] not implemented any coping skills." Tr. 861. She was "very focused on getting her disability and then traveling," "buying a motor home to travel in." *Id.* She stated she had no options for work or volunteering where she lived due to its distance from Klamath Falls. *Id.*

At her February 20, 2015 therapy appointment, Bute reported that she had come to counseling "so that she could use anxiety" on her disability claim. Tr. 862. She also wanted to "visit relatives after she gets disability and maybe buy a new house for herself." *Id.*

On March 6, 2015, Bute mentioned getting disability to buy a new home or motorhome, and her "main focus" seemed to be "getting money for material things, not focusing on her emotional issues." Tr. 863. Bute said, "I want the time and energy to sing, play guitar, and write songs," and "being on disability will allow that." *Id.* The therapist asked Bute to consider what she was getting from therapy aside from "a record so that she can apply for disability." *Id.*

Bute was again negative for skin rash in March 2015. Tr. 974.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential

inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 C.F.R. §§ 404.920(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 C.F.R. §§ 404.920(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 C.F.R. §§ 404.920(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the

claimant can perform other work in the national economy. 20 C.F.R. §§ 404.920(a)(4)(v) & (g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); *Tackett*, 180 F.3d at 1099.

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. §§ 404.920(a)(v) & (g), 416.920(a)(4)(v) & (g).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Bute had not engaged in substantial gainful activity since August 1, 2012, the alleged onset date. Tr. 23.

At step two, the ALJ determined that Bute has the following severe impairments: hip degenerative joint disease; plantar fasciitis; sinus tarsi syndrome; obesity; and left shoulder degenerative joint disease. Tr. 24. The ALJ found the following impairments to be non-severe: hypertension and hyperthyroidism; HS; and depression and anxiety. *Id.*

At step three, the ALJ concluded that Bute does not have an impairment or combination of impairments that meets or equals any listed impairment. Tr. 26. The ALJ found that Bute has the RFC to perform sedentary work except that she can have no repetitive pushing with the left foot; can occasionally climb ramps and stairs, but never ladders or scaffolds; can occasionally stoop, kneel, crouch, crawl, and balance; would need the option to alternate sitting and standing at will, but can remain on task while doing so; can never reach overhead bilaterally; and must avoid exposure to hazards, including

unprotected heights, moving mechanical parts, and would need to avoid operation of a motor vehicle as an essential function of a job.  Tr. 26.

The ALJ determined at step four that Bute was able to perform her past relevant work as a mortgage banker.  Tr. 32-33.

Accordingly, the ALJ determined that Bute was not disabled at any time since her application date, August 1, 2012, through the date of the decision, May 11, 2015.  Tr. 33.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).  The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1205 (9th Cir. 2008) (citing *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004)); *see also Lingenfelter*, 504 F.3d at 1035.

///

///

///

**DISCUSSION**

Bute alleges that the ALJ erred in the assessment of (1) the severity of her HS condition at step two; (2) her subjective symptom testimony; (3) medical source opinion evidence; and (4) lay witness testimony.

## I. Step Two--Hidradenitis Suppurativa

Bute contends the ALJ erroneously found her HS condition was not "severe" at step two. The step two inquiry is a *de minimis* screening device used to dispose of groundless claims. *Bowen*, 482 U.S. at 153-54. The claimant bears the burden of establishing that she has a severe impairment at step two by providing objective medical evidence. 20 C.F.R. §§ 404.1512(a), 416.912(a). An impairment is "not severe" if it does not "significantly limit" a claimant's ability to conduct basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If an ALJ fails to properly identify a severe impairment at step two, but nonetheless considers the erroneously omitted impairment at subsequent steps of the sequential evaluation process, the step two error is harmless. *Lewis,* 498 F.3d at 911.

With respect to Bute's HS, the ALJ found that, "[a]lthough [Bute] testified to experiencing breakouts 5-6 times per month, . . . the record does not support this." Tr. 24. The ALJ noted that, when medically examined by Dr. Hartley, Bute had no inflammation. *Id.* (citing Ex. 24F/79 (Tr. 942)). The ALJ also noted that Bute's doctors did not observe an increase in lesions, and Bute was able to manage the HS with ointment and wash. Tr. 24. Bute "was instructed to call when she had a flare up, yet the record does not support the claimant seeking treatment 5-6 months for a flare up." *Id.* Bute was "not only . . . capable of working despite experiencing these lesions, . . . she [was] currently able to control these

symptoms." Thus, the ALJ concluded, the HS "does not cause more than a minimal effect on the claimant's ability to complete basic work activities[, therefore,] it is a nonsevere medically determinable impairment." *Id.*

The medical record supports the ALJ's finding. While Bute claimed to suffer HS flares five to six times per month, in the entire medical record, there are only two instances where Bute was observed to have HS symptoms: November 7, 2011, and February 25, 2015. Tr. 567, 997. Additionally, as the ALJ noted, although Bute's treating physician instructed her to call if she was having an outbreak (Tr. 424), there is no record that Bute ever called, let alone five to six times per month. Indeed, Bute was consistently observed to be free of skin rashes on examination throughout the years. *See, e.g.*, Tr. 373, 379, 362-64, 393-94, 401, 424, 789, 909, 915, 943, 974, 981, 991, 995, 1008-09. Moreover, at the administrative hearing, Bute testified that she was managing the HS "pretty well right now." Tr. 57. Accordingly, the ALJ's determination is supported by substantial evidence.

Bute claims that the ALJ placed too much weight on the fact she previously worked while suffering from HS. Bute claims the stress of her job and restrictive professional clothing made her HS worsen and was one of the reasons she quit. Pl.'s Br. 10; Tr. 57. She also contends that because she cannot dress in work-appropriate clothing on the several days a month she suffers from a symptom flare-up, this makes her condition disabling.[6] *Id.* However, Bute's argument is premised on her discredited assertion that she suffers

---

[6] Bute testified in detail about her condition, the location of her inflammation, and the efforts she has to make when there is an outbreak. Those details can be found in her hearing testimony. Tr. 56-57. Suffice to say, she described "an extremely painful" condition that worsened if she did not diligently care for it and that worsened if she wore business attire all day. Tr. 57. Even if she carried extra clothes and tried to clean the area, she still experienced "massive breakouts." *Id.*

symptoms multiple times per month. The burden of proof rests on the claimant at step two, and here, Bute failed to provide objective evidence that her HS condition limits her as frequently as she alleges. Even if the record could be read to support her position that her HS flares are frequent and unpredictable, this court is bound to affirm the ALJ's finding because it was rational and based on substantial evidence. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997) (the "key question is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual finding that claimant is not disabled.").

Furthermore, because the ALJ considered the limiting effects of Bute's HS condition at subsequent steps of the sequential process, any error in failing to find it was "severe" at step two was harmless. *See* Tr. 26 (determining HS impairment did not meet relevant listing at step three); *Lewis*, 498 F.3d at 911.

## II.     Subjective Symptom Testimony

Bute assigns error to the ALJ's assessment regarding the credibility of her subjective symptom testimony. When a claimant has medically-documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The

reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

At the administrative hearing, Bute testified that she stopped working as a mortgage banker due to stress and anxiety, which was compounded by the financial crisis and the dissolution of her marriage. Tr. 49-50. She explained that she and her current husband, who had been a neighbor and friend, married and moved to Bly, Oregon. Tr. 54. Bute stated that she and her husband have a fifth-wheel that they enjoy, although they do not use it as often as they would like due to health and financial concerns. Tr. 55. Bute testified that her legs swell up when she drives long distances, although it was noted she independently drove 140 miles each way in order to attend her hearing. Tr. 56, 71-72.

Bute also testified that her HS prevents her from working because when she has flare-ups from associated lesions, she has to frequently clean herself and change clothing, and she cannot wear "business clothes all day, or any kind of clothes." Tr. 56-57. She endorsed problems with her left hip and plantar fasciitis, which makes standing or walking for more than 30-minute durations difficult. Tr. 59-60, 404. In her function report, Bute stated that she has difficulty walking when she awakes but is able to perform light household chores, care for her small dogs, and prepare simple meals. Tr. 255-56. Bute described engaging in social activities such as visiting family and friends weekly, attending church weekly, and attending Red Hat Society meetings. Tr. 257.

Bute contends that the ALJ impermissibly "rejected [her] pain testimony because [he] believed the medical evidence did not support the level of pain [she] suffered." Pl. Opening Br. 15, ECF #15. Citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990), Bute contends that the "Ninth Circuit has expressly held that this reason is *not* a legitimate reason to discount a claimant's pain testimony." *Id.* (emphasis in original).

However, the ALJ did not find that Bute's testimony was not credible regarding her level of pain, but rather that her allegations of functional limitation were not supported by the record. Tr. 29-31. The ALJ provided several examples in support, including lack of objective medical evidence, inconsistency with activities of daily living ("ADLs"), evidence of improvement with treatment, the reason she left her prior job, and the treatment of her impairments. *See* Tr. 24, 29-31. All of these factors are valid considerations in assessing subjective symptom testimony. *See* 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also* SSR 16-3p, 2017 WL 5180304, at *6 ("we will evaluate whether the [symptom] statements are consistent with the objective medical evidence and other evidence"), *7-8 (relevant factors include ADLs, treatment modalities and effect) (republished Oct. 25, 2017).

Bute also contends that the ALJ failed to cite any evidence in support of the conclusion that she was "not generally credible," in violation of SSR 16-3p. Pl.'s Opening Br. 17, ECF #15. However, SSR 16-3p, which became effective on March 28, 2016, was not applicable at the time of the ALJ's May 11, 2015 decision. Moreover, contrary to Bute's claim, the ALJ indeed did provide specific evidence in support of the finding.

As discussed in the previous section, the ALJ found that Bute's testimony regarding the limiting effects of her HS condition was not supported by the record: although Bute

maintains that she has five to six HS outbreaks each month, the medical record reflects only two outbreaks from 2011 until 2015. Tr. 24, 567, 597. While lack of corroborating objective evidence may not be the sole reason for an ALJ to reject a claimant's symptom testimony, it is a valid factor. *See Reddick*, 157 F.3d at 722.

The ALJ further supported his finding by observing that Bute's doctors "have not noted an increase in lesions and [Bute] has continued to manage the [HS] with ointment and wash." Tr. 24. In October 2013, Bute's treating physician, Debra Hartley, M.D., noted that Bute was negative for skin rashes at that treatment visit and directed her to call-in if she experienced an HS flare. Tr. 943. However, there is no record of any subsequent HS flare until February 24, 2015, and at that time Dr. Hartley noted that Bute's dermatologist had increased one of her medications, "which may have helped" her condition. Tr. 977. The ALJ did not err, therefore, in finding Bute's infrequent treatment record was inconsistent with her assertion that she suffered flares five to six times per month. Moreover, Bute testified that she was "managing it pretty well right now," and impairments that can be controlled effectively with treatment are not disabling under the Act. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

In her briefing, Bute asks the court to imagine a scenario where, while at work, she has to deal with a bursting HS lesion prior to a meeting with a client, and is forced to leave work, change clothes, bathe, and treat the lesion with medicinal ointment. Pl. Opening Br. 12-13, ECF #15. However, the scenario Bute describes presumes that her allegations regarding outbreak frequency are supported by the medical record, which they are not. The persuasive power of this hypothetical incident is further undermined by the fact that Bute was previously able to work despite her HS condition, and there is no indication that she

required any special accommodation. *Cleveland v. Policy Mgmt. Syss. Corp.*, 526 U.S. 795, 803 (1999)) (explaining the SSA may not consider "special accommodation" in a Social Security Administration disability determination).

Bute also assigns error to the ALJ's assessment of her ADLs. Pl. Opening Br. 15, ECF #15. An ALJ may consider whether a claimant's ADLs are inconsistent with her allegations, or if certain activities meet a threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The ALJ found that despite Bute's allegations of severely limiting foot and hip pain, Bute was able to "remain active," including caring for her horse, cleaning horse stalls, hiking, walking, and camping. Tr. 30, 412. Notably, Bute's podiatrist provided foot injections occasionally, which were reported to be effective and allowed Bute to continue walking more than a mile each day and hike on level surfaces. Tr. 30, 774; *Warre*, 439 F.3d at 1006. Further, Bute told Dr. Hartley in 2014 that she typically took between 4,000 and 5,000 steps each day. Tr. 28, 30, 739. As the ALJ observed, Bute's consultative examination demonstrated "normal gait, good range of motion, normal strength, and normal reflexes." Tr. 31, 400.

Bute argues that the ALJ relied only upon what she can do on "good days," but that she is unable to perform the ADLs on a continuous basis, eight hours per day, five days per week. However, because the ALJ's finding was "supported by inferences reasonably drawn from the record," the finding must be upheld. *Tommasetti*, 533 F.3d at 1038. Moreover, the ALJ recognized Bute has *some* limitations due to her foot and hip pain and incorporated those limitations into the RFC, which allows only sedentary work with an option to alternate between sitting and standing. Tr. 26.

Bute additionally assigns error to the ALJ's evaluation of her anxiety symptoms. The ALJ found that Bute's "desire to obtain disability benefits appears to be motivated by factors other than her impairments." Tr. 30. The ALJ noted that Bute reported to her mental health counselor,[7] Sara Allen, that she sought treatment in order to "use anxiety on the disability claim." *Id*. The ALJ noted that Allen told Bute if she wanted to continue being treated, she would need to explain what she hoped to gain and what emotional factors she wanted to address, indicating that Bute was "not solely motivated by significant limitations, but rather by her need to 'make a record' for her disability claim." *Id.* "Further, the claimant reported once she obtained disability benefits, she would buy a motorhome and travel, visit family, write music, play guitar and sing." *Id.* The ALJ's observations about Bute's financial motives are amply supported by the counseling records. Tr. 860-63.

The court recognizes that some motivation of pecuniary gain is inherent in any application for disability. *See, e.g. Ratto v. Secretary, Dept. of Health and Human Services*, 839 F. Supp. 1415, 1428-29 (D. Or. Aug. 13, 1993) ("By definition, every claimant who applies for Title II benefits does so with the knowledge—and intent—of pecuniary gain."). Here, however, the ALJ's finding was supported by explicit evidence that Bute sought treatment in order to create a written record to bolster her disability application, rather than to address her alleged anxiety symptoms.

---

[7] The record is not completely clear whether Allen was Bute's "mental health counselor," or a licensed clinical social worker. *See* Pl.'s Br. at 15, Def.'s Br. at 14 n.40. The ALJ did not assign specific weight to Allen's written statements or adopt any statements as medical opinion evidence; as such, the distinction was not material to the ALJ's decision. To the extent Bute argues the ALJ erroneously adopted Allen's comment that "typically medical [impairment] is stronger for a disability claim," there is no indication that the ALJ accorded significant credence to the statement, nor is it clear that the comment impacted the ALJ's evaluation of Bute's physical impairment. *See* Tr. 29, 835; Pl.'s Br. at 15; Pl.'s Reply at 6.

The ALJ also did not rely only on Bute's financial motives: Rather the ALJ

concluded that Bute's "reported desire to engage in these activities not only suggest that

financial reasons may be contributing to limiting her activities of daily living, but also

suggests [Bute] feels that her impairments do not and would not prevent her from engaging

in these activities." The ALJ noted that Bute did not appear anxious or depressed at her

therapy appointments. Tr. 30. Additionally, despite Bute's testimony that she is constantly

overcome with anxiety, the ALJ noted that she had an active social life, including visiting

with family members, attending church weekly, and attending Red Hat meetings monthly.

Tr. 27. Accordingly, the ALJ's conclusions were based a totality of inferences reasonably

drawn from the record that Bute's anxiety does not significantly limit her ability to perform

work. *See Tommasetti*, 533 F.3d at 1038. Because the ALJ's finding was rational and

supported by substantial evidence, it would be inappropriate for the court to reverse. *Burch*,

400 F.3d at 679.

### III.    Medical Source Evidence

Bute assigns error to the ALJ's assessment of several medical source opinions of record.

The ALJ is responsible for resolving conflicts in the medical record, including conflicting

physicians' opinions. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir.

2008). The Ninth Circuit distinguishes between the opinions of three types of physicians:

treating physicians, examining physicians, and non-examining physicians. The opinions of

treating physicians are generally accorded greater weight than the opinions of non-treating

physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion

that is not contradicted by the opinion of another physician can be rejected only for "clear and

convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If, however, a

treating physician's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating physician's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's ADLs. *Tommasetti*, 533 F.3d at 1040.

Bute asserts the ALJ erroneously disregarded the medical source opinion of Mills, the physical therapist who examined her in July 2014. Mills opined that in an eight-hour workday, Bute could sit for four hours, and stand or walk for two hours each. Tr. 834. Mills also opined that Bute would require four unscheduled position changes each day, and would have "a difficult time in most occupations" due to her "multiple medical conditions." Tr. 837. The ALJ accorded Mills' opinion little weight, noting that his diagnoses were unsupported, he is not an acceptable medical source, the record did not establish a significant treating relationship, his opinion was self-contradictory, and he was not qualified to opine on the issue of disability because it is reserved to the Commissioner. Tr. 31.

As a physical therapist, Mills is considered a non-acceptable medical source. SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Thus, although the ALJ was required to consider his opinion, the ALJ could reject it by providing reasons germane to Mills. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). Even so, an opinion of a treating source whom is not an acceptable medical source *may* outweigh the opinion of an acceptable source, "if he or she has seen the individual more often than the [other, acceptable] treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-03p at *5.

Here, the ALJ found that there was "little to no" record of Mills' treatment and Mills "did not evaluate[] claimant on an ongoing and consistent basis." Tr. 31. Indeed, the record does not contain further evidence of treatment by Mills, and Bute does not contest the finding. One of the primary factors an ALJ is to consider when weighing *any* medical source opinion is the duration, frequency, and nature of the treatment relationship. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ's rationale, therefore, was germane.

The ALJ also found that Mills' diagnoses of left lower back pain and radiculopathy were not supported by the record. The regulations require that an impairment must be established by objective medical evidence, including medical signs and clinical findings. 20 C.F.R. §§ 404.1527(b); 416.927(b). Mills is not an acceptable medical source, and his opinion alone cannot establish the existence of a medically determinable impairment. SSR 06-03p at *3. Moreover, although Dr. Hartley listed radiculopathy as a primary encounter diagnosis in a single chart note, the diagnosis was not supported by clinical testing or other objective medical evidence. Dr. Hartley noted that Bute had never had an MRI of her back. Tr. 898. Further, the diagnosis did not appear in any subsequent chart notes. Tr. 899; *see* Tr. 874, 878-881 888, 894-95. Accordingly, the ALJ did not err in rejecting Mills' opinion.

Bute further argues that Mills' opinion limiting Bute to sitting for four hours per day and providing unscheduled positional changes was supported by examining physician, Mike Henderson, D.O., who indicated that Bute would have to change position if she had an HS flare. *See* Tr. 401. The argument, however, is without merit: Mills provided no indication that he was considering, let alone aware of, Bute's HS condition in establishing his sitting and position-change limitations. *See* Tr. 834-37. Moreover, Dr. Henderson stated that he "cannot find objective evidence to limit sitting, standing, or walking," and as noted previously, the doctor

found Bute's HS condition to be "intermittent and treatable," and did not opine that it would require positional changes four times per day. Tr. 401. The ALJ did not err in rejecting Mills' opinion.

## IV. Lay Witness Testimony

Finally, Bute assigns error to the ALJ's assessment of the lay testimony provided by her husband, Michael Ward ("Ward").[8] Ward submitted a multipage function report and a written statement in favor of Bute's disability application, which the ALJ considered but ultimately assigned little weight to. *See* Tr. 240-47, 312-13. The ALJ was required to provide reasons germane to Ward in order to discount his testimony, and here, the ALJ did so. *See Molina*, 674 F.3d at 1114.

The ALJ noted that Ward's statements were not based on medical knowledge of her impairments, they were inconsistent with the objective medical evidence, and they were inconsistent with Bute's reported ADLs. Tr. 32. The ALJ noted, "[f]or example, Ward reported [Bute] goes outside daily to feed and pet the horse; however, [Bute] reported to her doctor that she cleans the stalls and walks the horse." *Id.* Indeed a medical record from August 16, 2013, indicates that Bute was "fairly active," had a horse and three acres, and "[s]hovels the horse stall, walks the horse, maintains feet and has to reset the sprinklers on the property daily." Tr. 412; *see also* Tr. 433 (chart note from August 9, 2013 stating: "Patient has been active (has a horse and is active with her horse . . ."). The ALJ also noted that Ward had "a natural tendency to agree" with Bute based on their close relationship. Tr. 32. Accordingly, the ALJ properly

---

[8] The ALJ referred to Ward as Bute's boyfriend, presumably because that is how Ward identified himself in his written statement of April 2013. Tr. 240. Bute testified that she and Ward were married in October 2013. Tr. 312.

inferred that Ward's testimony overstated the extent of Bute's functional limitations, which was germane to him.

Bute argues that even assuming she is able to clean up the horse stall and tend to the sprinklers on her property on occasion, the ALJ erred to the extent he assumed she performed the activities daily or for a substantial portion of the day. Pl.'s Br. at 19. Bute contends that cleaning a horse stall is a three-minute task, and the ALJ failed to inquire about the details of the activity. *Id.* However, the ALJ's interpretation was rational and supported by the record, and the court declines the invitation to adopt Bute's alternative interpretation of the record. *See Burch*, 400 F.3d at 679 ("Where evidence is susceptible to more than one interpretation, it is the ALJ's conclusion that must be upheld.").

Finally, Bute argues that it was error for the ALJ to discount Ward's testimony based on his personal relationship with her. Although the Court recognizes that an ALJ many not rely solely on characteristics common to all spouses to reject lay testimony, it was not the sole reason proffered here. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009). Because the ALJ provided a valid reason to discount Ward's testimony that was germane to him, any error in citing additional invalid reasons was harmless.[9]

///

///

///

///

///

---

[9] Bute additionally argues that the ALJ's hypothetical questions to the VE did not include all of her limitations. However, Bute's contention is essentially a restatement of her previous arguments, which are rejected for the reasons stated herein.

**CONCLUSION**

For the reasons discussed above, the Commissioner's decision is AFFIRMED.

DATED March 28, 2018.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge